******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# TYQUAN TURNER *v.* COMMISSIONER
# OF CORRECTION
# (SC 21222)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Dannehy and Bright, Js.

*Syllabus*

The petitioner, who previously had been convicted of felony murder, robbery in the first degree, and conspiracy to commit robbery in the first degree, sought a writ of habeas corpus, claiming, inter alia, that his trial counsel, H, had provided ineffective assistance by failing to challenge certain cell site location information (CSLI) evidence admitted at the petitioner's criminal trial. The petitioner's conviction stemmed from an incident in the city of Hartford during which the victim was robbed of his jewelry and shot. At the criminal trial, the state presented, among other evidence, the testimony of two eyewitnesses and W, a member of the Hartford Police Department. W testified about cell site technology generally and about specific cell phone data, including CSLI, that the police had obtained from the petitioner's cell phone carrier. W explained that he had entered the CSLI into a computer program that produced a time-lapse video purporting to depict the movement of the petitioner's cell phone on the day of the shooting, and the video was admitted into evidence without objection. The video depicted the petitioner's cell phone, represented by a human silhouette superimposed on a map of Hartford, moving in straight lines between relevant locations, including the crime scene and a pawn shop where the victim's jewelry had been sold shortly after the murder. W conceded on direct examination that the video and the underlying data could establish only that the cell phone was in an area associated with a particular cell site but that the data could not be used to establish that a person was in a particular location or that the cell phone was at any specific address. The state ultimately relied heavily on the CSLI evidence during closing and rebuttal arguments. At the petitioner's habeas trial, H testified that his trial strategy was to downplay the significance of the CSLI evidence and to focus on weaknesses in the eyewitness identifications. H also testified that he had opted not to challenge W during cross-examination but instead intended to use W's testimony to the petitioner's advantage during closing argument. The habeas court granted in part the habeas petition and ordered a new criminal trial, concluding that H had ultimately performed deficiently and that the petitioner had been prejudiced by H's deficient performance. On the granting of certification, the respondent, the Commissioner of Correction, appealed from the habeas court's judgment. *Held*:

The habeas court correctly determined that H had performed deficiently and that the petitioner had been prejudiced thereby, and, accordingly, this court affirmed the habeas court's judgment.

The respondent could not prevail on his claim that the habeas court's decision was based soley on H's failure to investigate the CSLI evidence and to cross-examine W, and the record established that the petitioner distinctly raised the claim that H had rendered ineffective assistance by failing to challenge the admissibility of the time-lapse video.

In construing the habeas court's decision, this court concluded that the habeas court had determined that reasonably competent counsel would have challenged the admissibility of the time-lapse video, that, because the video misrepresented the capabilities of CSLI, it would have been excluded from evidence if H had challenged its admission, and that H had performed deficiently specifically by failing to challenge or respond to the video.

Although the respondent claimed that the habeas court's finding that H had failed to investigate the CSLI evidence was not supported by the evidence, the habeas court's determination that H had performed deficiently did not depend on the extent of H's investigation into the CSLI evidence, as it was H's failure to challenge or respond to that evidence in any way that served as the basis for the habeas court's finding of deficient performance.

Moreover, although H's stated strategy of focusing on undermining the eyewitness identifications and to downplay the significance of the CSLI evidence rather than directly challenging W's testimony on cross-examination was not objectively unreasonable, H had failed to execute any such strategy at the petitioner's criminal trial, thereby allowing the state's strongest evidence to appear virtually unassailable.

Accordingly, H's failure to present any meaningful defense to the CSLI evidence, and, more specifically, the time-lapse video, was outside of the range of professionally competent assistance, and thus fell below the objective standard of reasonableness.

This court concluded, upon its independent review of the record, that the habeas court had properly assessed the impact of H's deficient performance on the outcome of the petitioner's criminal trial.

The state's case against the petitioner was not overwhelming and relied primarily on the CSLI evidence, including the time-lapse video, to connect the petitioner to the victim's murder, the prosecutor acknowledged that the CSLI evidence was the state's strongest evidence and relied extensively on the video in his closing and rebuttal arguments, and the identifications made by the two eyewitnesses were weak and had been effectively undermined by H.

Accordingly, there was a reasonable probability that the result of the petitioner's criminal trial would have been different if H had attempted to undermine the CSLI evidence, including the time-lapse video.

Contrary to the respondent's arguments, the petitioner's failure to call W to testify and to present new CSLI evidence at his habeas trial did not preclude a finding of prejudice under the circumstances of this case.

Argued April 15—officially released August 11, 2026

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Bhatt, J.*; judgment granting in

part the petition, from which the respondent, on the granting of certification, appealed. *Affirmed.*

*Jonathan M. Sousa*, assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, *Jo Anne Sulik*, senior assistant state's attorney, and *Gail P. Hardy*, former state's attorney, for the appellant (respondent).

*Vishal K. Garg*, assigned counsel, for the appellee (petitioner).

*Robert J. Meredith* and *Desmond M. Ryan* filed a brief for the Innocence Project, Inc., et al. as amici curiae.

*Opinion*

BRIGHT, J. The respondent, the Commissioner of Correction, appeals from the judgment of the habeas court granting in part the amended petition for a writ of habeas corpus filed by the petitioner, Tyquan Turner.[1] The habeas court concluded that the petitioner's criminal trial counsel, Attorney Walter D. Hussey, rendered ineffective assistance by failing to challenge the state's historical cell site location information (CSLI) evidence and that the petitioner was prejudiced as a result. On appeal, the respondent claims that the petitioner failed to establish both that Hussey had performed deficiently and that the petitioner was prejudiced by the allegedly deficient performance. We affirm the judgment of the habeas court.

The following background regarding the petitioner's underlying criminal conviction is relevant to the respondent's appeal. See *State* v. *Turner*, 334 Conn. 660, 224 A.3d 129 (2020); *State* v. *Turner*, 181 Conn. App. 535, 187 A.3d 454 (2018), aff'd, 334 Conn. 660, 224 A.3d 129 (2020). Shortly before 4 p.m. on July 13, 2013, the victim, Miguel Rodriguez, was fatally shot by two

[1] Upon the granting of his petition for certification to appeal from the judgment of the habeas court, the respondent appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

assailants while he was standing outside of 10-12 Flatbush Avenue in Hartford. *State* v. *Turner*, supra, 181 Conn. App. 539. Although two eyewitnesses, Charlene Lara and Jose DeJesus, gave statements to the police, the victim's family and friends refused to cooperate beyond reporting that his gold chain and medallion were missing. Id. Shortly after the shooting, Lorenzo Christian sold those items to a pawn shop located at 1154 Albany Avenue in Hartford, and he received a check in the amount of $1134. Id., 540, 548. Christian was unable to cash the check, so the petitioner called Alexandra Colon, the mother of his child, who agreed to cash it for Christian. Id. The petitioner and Christian picked up Colon from her house and drove to a bank on Park Street in Hartford, where Colon deposited the check in her account. Id., 548. After the check had cleared, Colon gave the proceeds to the petitioner. Id.

The day after the homicide, the police received a phone call from an unidentified person who implicated the petitioner in the shooting and provided the police with a photograph of the petitioner that had been circulated in the victim's neighborhood. See id., 540. A few weeks later, when officers attempted to apprehend him in Hartford, the petitioner avoided capture but dropped his cell phone in the process, which was then seized by the police. Id., 540–41. Colon later identified the phone as the petitioner's and gave the police the petitioner's cell phone number, which allowed the police to obtain call detail records, including CSLI, and account subscription information from the petitioner's cell phone carrier, formerly Sprint Corporation (Sprint). Id., 541. Those records revealed that the cell phone number had been changed on July 14, 2013, the day after the homicide. Id.

Sergeant Andrew Weaver of the Hartford Police Department analyzed the call detail records and entered the CSLI into a computer program, Oculus GeoTime, which produced a time-lapse video purporting to depict the movement of the petitioner's cell phone—represented by a purple, human silhouette—on a map of the city of

Hartford during the time of the homicide (GeoTime video). See id., 541–42; see also id., 542–43 n.6. "Weaver also took screenshots of the video at different times between approximately 3:24 and 5:08 p.m. on the day of the crime." Id., 542–43. The petitioner was arrested and charged with murder, felony murder, robbery in the first degree, and conspiracy to commit robbery in the first degree. Id., 543.

At trial, the state called several witnesses, including DeJesus, Lara, Colon, and members of the Hartford Police Department who were involved in the investigation. See id. The state introduced the cell phone records through Ray Clark, a records custodian at Sprint, and the trial court admitted those documents into evidence without objection. *State* v. *Turner*, supra, 334 Conn. 664; see also *State* v. *Turner*, supra, 181 Conn. App. 543–44. "On cross-examination, Clark testified that the call detail records allow a person to determine where a call was generated and where it ended in relationship to a particular cell site. Clark clarified, however, that 'you can't pinpoint and say [the phone] has to have been exactly here. This record simply says it had to have been in the vicinity of this particular cell site at the time the phone call began and, likewise, at the time the phone call ends.' Clark explained that a cell phone is within the vicinity of a particular cell site when it is within the range of that cell site, the range being approximately two miles in larger cities like Hartford.

"Weaver was called to testify next. The state did not disclose Weaver as an expert witness, although the trial court instructed the jury that he provided expert testimony." *State* v. *Turner*, supra, 334 Conn. 664–65. Weaver testified that each cell site typically has three antennae, each of which provides coverage for a different 120 degree sector of the cell site's circular coverage area, and he estimated that the average coverage area in Hartford would extend approximately one and one-half miles from the cell site. Id., 665–66. He noted that, although cell sites are designed to limit overlapping coverage areas

to reduce interference and dropped calls, some overlap remains to allow for "'seamless transmission'" from one cell site to the next. Id., 666. Weaver explained that a cell phone generally connects to the cell site with the strongest signal, which is often—but not always—the closest one. Id. For example, a more distant cell site may emit the stronger signal if there are obstructions between the closest cell site and the phone. Id.

Weaver testified that Sprint's call detail records identify the sector of the cell site through which a call is routed and the coordinates of the cell site. Id., 665. He explained that he inputted that information into Oculus GeoTime, which created the GeoTime video depicting "a map that visually represents the calls over time."[2] Id., 665–66. Consistent with Clark's testimony, "Weaver clarified that the cell phone data and subsequent map show only that 'the phone itself was in a certain area' but do not establish that a certain person was in a certain area or provide a specific address at which the phone was located." Id., 666.

Despite those well established limitations, the GeoTime video showed a human figure imposed on an underlying map of Hartford and moving in straight lines from the center of one orange, pie shaped coverage area to the next. The GeoTime video and the corresponding screenshots were admitted into evidence without objection. See id., 673. "Weaver explained that '[w]hat we do, once we have the [cell sites] associated on the map, the program, we add in the data that [come] from the cell phone company about the calls that were made. So, we know at . . . 3:24 in the afternoon, that . . . the cell phone [at issue] made a call, and it was routed through that pie shaped area. What we do is, the next call is routed through another [sector], or it can be the same [sector], in which case, you wouldn't show movement [on the map]. . . . [T]he movement is actually just [showing] where the cell phone

---

[2]Weaver testified that the GeoTime program "will move you over time based on when your calls start and end. It will move you over time across the map to the next tower."

goes over time. So, we move it from the center of one coverage area to the center of the next coverage area. I can't tell you which streets were driven down. The—the only thing we can be 100 percent sure of is, the phone calls were made and that at some point the cell phone traveled between—from one coverage area to the next coverage area.'

"The [GeoTime video] showed that, at 3:25 p.m. on the day of the shooting, the cell phone that the [petitioner] dropped was in a particular cell coverage area, in which was 1154 Albany Avenue, the address for the pawn shop where the victim's gold chain and medallion were sold. At 3:53 p.m., near the time of the murder, the cell phone was located within another coverage area, near 18 Flatbush Avenue, the location of the crime scene. Although the crime scene was located just outside of the [depicted] coverage area of the [cell site] that routed the 3:53 p.m. call, as explained, Weaver testified that a cell phone may [connect to a more distant cell site with a] better signal. Then, at approximately 4:17 p.m., the maps showed the cell phone again within the cell coverage area that included the location of the pawn shop." Id., 666–67.

During summation, the prosecutor focused extensively on the CSLI evidence, arguing that "the strongest piece of evidence is the phone" and referring to the GeoTime video as "a virtual map as to what happened." The prosecutor narrated the GeoTime video for the jury, suggesting that the movement of the depicted human figure tracked the petitioner's movements as he visited all of the incriminating locations on the day of the crime, including Christian's residence, the crime scene, the pawn shop, Colon's residence, and his own residence.[3]

---

[3]The prosecutor stated that the GeoTime video showed that "the person holding this phone leaves" the petitioner's residence at 3:06 p.m., travels toward Albany Avenue, and, by 3:25 p.m., "he's moving from that area" where Christian lived. "The [petitioner] and his phone are on top of the shooting scene," then the petitioner's "phone stays" near the pawn shop before "the [petitioner], with his phone, moves about the city of Hartford." The prosecutor described the petitioner's stopping near Colon's residence so that she could cash Christian's check and argued

The prosecutor concluded his summation by stating that the petitioner himself recognized "the extreme value of the phone records" because he changed his phone number the day after the crime.

Hussey countered that the state had relied on the CSLI evidence because the eyewitness identifications had been weak. The majority of Hussey's closing argument focused on the flaws in the testimony of Lara and DeJesus, and the deficiencies in the investigation by the Hartford Police Department. As to the cell phone, Hussey primarily argued that the state had failed to prove that the phone belonged to the petitioner and suggested that the phone likely belonged to Christian: "They talk about the movement of the phone, but they don't tell you who has the phone. . . . Who could have had that phone? . . . Christian? Yeah."[4] Hussey briefly touched on the CSLI evidence, arguing: "Weaver said . . . I can't tell you which way they were driving. I can't tell you who had the phone. I can't even tell you really where it was. I can tell you where they weren't. Well, it looks like they're back and forth. And if—if it really was his phone and he had the phone, he doesn't go anywhere." Hussey offered no other direct commentary on the CSLI evidence and concluded by arguing that "all this other [evidence is a] smoke screen [and] doesn't have any significance, because [the petitioner] has to be identified beyond a reasonable doubt as [the person] pulling that trigger and robbing that chain. It hasn't been done."

In rebuttal, the prosecutor reiterated his narration of the GeoTime video and argued that there was no question that the petitioner was guilty of felony murder, despite any reasonable doubt as to whether he was the shooter. The prosecutor concluded by focusing on the

that "the person holding this phone at the end of the evening on July 13 ultimately will come to stay" at the petitioner's residence.

[4] Hussey argued that "[Christian is] the guy who, within an hour or two of the crime, is what? Pawning that chain, right? He lives right by [the pawn shop]. . . . Who's to say [Christian] didn't call [the petitioner] and say, I got a chain. I got a check that I just pawned. Can your girl cash a check for me?"

CSLI evidence and Colon's testimony, noting that the "phone and its records loop around . . . every point of interest related to the crime," and that the petitioner asked Colon to cash a check for Christian shortly after the victim was killed.

The jury found the petitioner guilty of felony murder, first degree robbery, and conspiracy to commit first degree robbery, but not guilty of murder. *State* v. *Turner*, supra, 334 Conn. 667–68. The trial court sentenced the petitioner to seventy years of incarceration, and the petitioner appealed from the judgment of conviction. Id., 668. While the petitioner's appeal was pending in the Appellate Court,[5] we issued our decision in *State* v. *Edwards*, 325 Conn. 97, 129–33, 156 A.3d 506 (2017), in which we held that expert testimony regarding CSLI evidence is the type of scientific evidence that warrants a *Porter* hearing[6] to determine whether it is based on reliable scientific methodology.

Before the Appellate Court, the petitioner claimed, inter alia, that the trial court's qualification of Weaver as an expert witness and its admission of CSLI coverage maps violated his due process right to a fair trial because that scientific evidence "does not satisfy the reliability safeguards [then] required by [*Edwards*]."[7] (Internal

[5]The petitioner appealed directly to this court pursuant to General Statutes § 51-199 (b) (3), and we transferred his direct appeal to the Appellate Court pursuant to § 51-199 (c) and Practice Book § 65-1. See *State* v. *Turner*, supra, 181 Conn. App. 544 n.10.

[6]In *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), "we followed the United States Supreme Court's decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and held that testimony based on scientific evidence should be subjected to a flexible test to determine the reliability of methods used to reach a particular conclusion. . . . A *Porter* analysis involves a two part inquiry that assesses the reliability and relevance of the witness' methods." (Internal quotation marks omitted.) *State* v. *Turner*, supra, 334 Conn. 669.

[7]The petitioner also claimed that there was insufficient evidence to convict him of conspiracy to commit robbery in the first degree, prosecutorial impropriety deprived him of his right to a fair trial, and the trial court improperly instructed the jury regarding robbery in the first

quotation marks omitted.) *State* v. *Turner*, supra, 181 Conn. App. 549. Because Hussey neither objected to Weaver's testimony nor requested a *Porter* hearing to challenge the state's CSLI evidence, the petitioner sought review of his unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), and the plain error doctrine. *State* v. *Turner*, supra, 181 Conn. App. 549. The Appellate Court affirmed the judgment of conviction; id., 571; concluding that the petitioner's unpreserved evidentiary claim was unreviewable under *Golding*; id., 551; and that the petitioner could not prevail under the plain error doctrine because "[Hussey] made a strategic decision not to object to the [CSLI] evidence or Weaver's qualification . . . ."[8] Id., 552. We granted certification to appeal;[9] *State* v. *Turner*, 330 Conn. 909, 193 A.3d 48 (2018); and affirmed the judgment of the Appellate Court. *State* v. *Turner*, supra, 334 Conn. 687.

The petitioner filed the underlying habeas petition while his direct appeal was pending, and he filed the operative amended petition in October 2023, shortly before the second day of the habeas trial. In the operative petition, the petitioner alleged, inter alia, that Hussey performed deficiently by failing (1) to request a *Porter* hearing or "to otherwise challenge the introduction of expert testimony regarding call detail mapping analysis and [the] admission of cell phone coverage maps," (2)

degree. *State* v. *Turner*, supra, 181 Conn. App. 538. The Appellate Court rejected those claims. Id., 538–39.

[8] The Appellate Court declined to exercise its supervisory authority to review the petitioner's unpreserved claim. *State* v. *Turner*, supra, 181 Conn. App. 555 n.17.

[9] We granted the petitioner's petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court properly determine that the petitioner was not entitled to review, under *State* v. *Golding*, [supra, 213 Conn. 233], of his unpreserved claim that the trial court [had] improperly admitted cell tower coverage maps?" And (2) "[d]id the Appellate Court properly determine that the petitioner was not entitled to plain error review of his unpreserved claim that the trial court [had] improperly admitted cell tower coverage maps?" *State* v. *Turner*, 330 Conn. 909, 193 A.3d 48 (2018).

to "prepare and . . . present the petitioner's defense by . . . investigating legal, scientific, and factual issues related to call detail mapping analysis, cell phone coverage maps, and [CSLI] evidence generally," and (3) to "cross-examine, impeach, or otherwise challenge the testimony of" Clark and Weaver.[10]

At the habeas trial, copies of materials from the petitioner's criminal trial and subsequent appeals were admitted into evidence, including the trial transcripts, court file, CSLI exhibits, and appellate briefs and appendices. The petitioner called several witnesses, including Hussey, Joseph John Kennedy, who testified as an expert in digital communications and cellular analysis, and Attorney Aaron J. Romano, who testified as a criminal defense expert.

Hussey testified that he focused his efforts on the state's two eyewitnesses who had identified the petitioner as one of the assailants. Hussey did not recall doing any specific research regarding Weaver's testimony or the CSLI evidence in the petitioner's case, but he did research the topic for a different case in which he was involved in Bridgeport. Hussey testified: "[T]he reason why I know [about CSLI] is because I had to read things, and my issue is [that] I'm not sure if this case [preceded] or [if] it was [at] the same time as that case in Bridgeport. . . . But it seems to me [that] it was [at] about the same time." He was aware that Weaver likely would testify about the CSLI at trial but did not become aware of the visual aids until "late in the game, closer to the point of trial." Hussey, however, had no recollection of investigating the

---

[10]The petitioner also claimed that (1) the state had violated his due process right to a fair trial by failing to disclose exculpatory materials in violation of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), (2) his due process right to a fair trial was violated by the introduction of unreliable and misleading call detail mapping analysis and by the state's failure to correct false or substantially misleading testimony, and (3) his appellate counsel rendered ineffective assistance. In his posttrial brief, the petitioner abandoned his claim of ineffective assistance of appellate counsel, and the habeas court rejected the petitioner's due process claims. The petitioner has not cross appealed to challenge the habeas court's judgment on those counts.

substance of Weaver's expected testimony, and he recognized "certain flaws" in Weaver's testimony. He noted that Weaver's testimony suggested that the petitioner was in a specific location, which "you really can't do" with the call detail records. When asked why he decided not to cross-examine Weaver, Hussey responded that "I didn't want to [go] toe-to-toe with him because he had the advantage. So, I figured I would just use what he said to my advantage in my closing."

Regarding the GeoTime video in particular, Hussey testified that he saw no basis for challenging the video's depiction of the cell sites and coverage areas because that information is "real and demonstrative," but he recognized that he could have objected to the depiction of a human figure moving around the map because it was "more prejudicial than probative." Hussey explained that he was not "completely concerned with" the video because Weaver "had to acknowledge that you're at least" one and one-half miles away from the cell site, which made the video appear to be "a reach" by the state to compensate for the lack of any direct evidence. Hussey admitted, however, that he "was wrong in [his] assessment of the damage that was done, but [he] thought it could be explained away as more or less a reach. And, if you're two miles away, you're two miles away." Hussey assumed that "the distance obviously [would have been] the focal point" of his summation because "Weaver said that he couldn't say who had the phone in their hands, [and] he couldn't say what street they were on. He really couldn't say anything . . . with any degree of certainty . . . ."

On cross-examination, Hussey testified that, generally, he would forgo cross-examination if he thought that (1) the witness did not "hurt our case," or (2) cross-examination would "make us look worse" because Hussey "didn't have a lot to work with . . . ." When asked about his strategy of forgoing cross-examination and using Weaver's testimony to his advantage in closing, Hussey explained that he viewed "the cell phone [as] an attempt

to backdoor a conviction, and [he] didn't think it was going to work. . . . [T]o [Hussey], it looked . . . more desperate than what it turned out to be, which, obviously, was damning."

Romano testified that reasonably competent counsel would have **(1)** requested a *Porter* hearing to challenge call detail mapping in general, **(2)** filed a motion in limine to exclude the GeoTime video on the ground that its depiction of a human figure moving in linear paths to and from specific places on the map was likely "to mislead the jury," **(3)** cross-examined the state's expert to challenge the accuracy of the GeoTime video, and **(4)** presented testimony from a defense expert. Romano opined that, at the time of the petitioner's criminal trial, reasonably competent counsel with a basic understanding of CSLI and its limits "would be able to know that [the GeoTime] video . . . is misleading" because "it purports to demonstrate that there's movement" when the underlying data do not establish "that, indeed, there is movement." He further opined that, absent an objection to the admissibility of the GeoTime video, reasonably competent counsel would have challenged the accuracy of the video through cross-examination. Romano also testified that he was unable to envision any circumstances in which reasonably competent counsel would allow CSLI evidence to be admitted at trial without challenging it.

Kennedy, who had reviewed the materials of the petitioner's criminal trial, testified regarding the limitations of CSLI, including that CSLI cannot pinpoint an exact location and that switching cell sites does not necessarily indicate movement. Kennedy testified that, on the basis of the call detail records in the petitioner's case, only the coverage areas for the cell sites through which calls were routed could be determined, and attempting to specify the phone's location within a particular coverage area "would just be speculation, just a random guess."

In his posttrial brief, the petitioner argued that Hussey performed deficiently by "failing to adequately prepare and present the petitioner's defense to the state's

[CSLI] evidence" and that Hussey failed to "raise available challenges to the admissibility and scope of such evidence." The respondent countered that the petitioner had failed to prove his ineffective assistance claims based on Hussey's "[failure] to raise novel claims pertaining to the admission of [CSLI] evidence" or to demonstrate prejudice attributable to that deficient performance because "whether the trial court would have granted a motion for a *Porter* hearing in the pre-*Edwards* environment in which the petitioner's [criminal] case was tried is entirely speculative." In his reply, the petitioner argued that the respondent had failed to "address the petitioner's claim that Hussey was ineffective because he did not request the removal of the depiction of a person moving around the city from the [GeoTime video] that accompanied Weaver's testimony. Hussey [offered no] strategic basis for his failure, and the prejudicial nature of the completely misleading visual representation speaks for itself."

The habeas court subsequently issued its memorandum of decision and granted in part the petition.[11] The court applied the two-pronged test for ineffective assistance of counsel claims set forth in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which requires a petitioner to demonstrate both that (1) counsel performed deficiently (performance prong), and (2) counsel's deficient performance prejudiced the petitioner (prejudice prong). The court concluded that Hussey performed deficiently by failing "to challenge the admissibility of [CSLI] testimony, including [the GeoTime video] purporting to show the [petitioner's] path of travel, from . . . Weaver and that this failure prejudiced [the petitioner]." The court found that the GeoTime video "actively misrepresented" the CSLI evidence by showing a human silhouette moving in straight lines between precise locations within each cell site's coverage area, even though that evidence could not be used to determine the phone's precise location or movements. The court observed that the CSLI evidence could

[11]See footnote 10 of this opinion.

have been presented in several "alternat[ive] and equally correct" ways,[12] but "the state chose to represent the cell phone [as] a silhouette of a person traveling along a path that coincided with key locations in this case."

As to *Strickland*'s first prong, the court reasoned that "Hussey's strategy of attacking [the eyewitness] identifications was a reasonable trial strategy. However, [despite] having experience with Weaver and CSLI evidence . . . Hussey neither investigated the CSLI data, requested a *Porter* hearing, appreciated the impact the GeoTime [video] likely would have on the jury, [nor] in any way challenged Weaver's testimony and [related] evidence. There is no evidence that [he] even did a rudimentary investigation into the CSLI [evidence] and Weaver's likely testimony. This complete lack of investigation prior to trial . . . is evidence of deficient performance by trial counsel that allowed the state to present uncontested evidence that connected [the petitioner] to the charged offenses. Weaver's testimony and the GeoTime [video were] central to the state's case and [were] not cumulative. That evidence was . . . the proverbial circumstantial glue that held together the fabric woven by the state's evidence. . . . Hussey neither investigated the CSLI evidence nor conducted *any* cross-examination of Weaver. . . . [T]his is deficient performance below that of . . . reasonably competent trial counsel." (Emphasis in original.)

As to the prejudice prong, the habeas court determined that the petitioner failed to prove that he had been prejudiced by Hussey's failure to request a *Porter* hearing because he had not shown that the CSLI evidence would have been excluded altogether. The court, however, concluded that the petitioner demonstrated that he had been prejudiced by Hussey's failure to challenge the admissibility of the misleading GeoTime video and

---

[12]The habeas court reasoned that "[r]epresenting the cell phone could just as validly have been done by showing a single, unmoving dot for the entire duration, or a silhouette moving in a haphazard, random pattern at the edge of one or all of the [coverage areas], or even a silhouette slowly turning in circles of ever increasing radii around a central point."

Weaver's related testimony.[13] The court reasoned that the eyewitness testimony presented at the petitioner's criminal trial was weak, whereas the GeoTime video was "uncontested, uncontradicted, and highly suggestive," and "Weaver's expert opinion would have been viewed as highly convincing." The court emphasized that the prosecutor relied extensively on the GeoTime video in summation and rebuttal, thereby magnifying the impact the misleading evidence had on the jury. The court therefore granted in part the petition, vacated the petitioner's conviction, and ordered a new criminal trial. This appeal followed. See footnote 1 of this opinion.

The applicable standard of review is well settled. In reviewing ineffective assistance of counsel claims, although the habeas court's factual "findings will not be disturbed unless they are clearly erroneous . . . [t]he application of [the pertinent legal standard to] the habeas court's factual findings . . . presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Diaz* v. *Commissioner of Correction*, 344 Conn. 365, 373, 279 A.3d 147 (2022).

I

Before considering the respondent's claims on appeal, we must resolve the parties' dispute regarding the basis for the habeas court's judgment. The respondent claims that "the granting of the writ was solely based on Hussey's failure (1) to investigate the CSLI evidence, and (2) to cross-examine Weaver," whereas the petitioner contends that the habeas court concluded that Hussey "failed to adequately prepare and [to] present a defense to the state's [CSLI] evidence" on the basis of Hussey's "complete failure to respond to the highly misleading GeoTime" video. The parties also disagree as to whether the habeas court found that the GeoTime video would have been excluded if Hussey had objected

---

[13]The habeas court framed the prejudice inquiry as whether "the jury's verdict [was] substantially influenced by Weaver's uncontested testimony and use of the GeoTime rendition of [the petitioner's] movements . . . ."

to its admissibility on the grounds that it was misleading and unduly prejudicial.

In his reply brief, the respondent argues that any claim that Hussey performed deficiently in failing to object to the GeoTime video as misleading or prejudicial is unpreserved because the petitioner did not distinctly raise that claim before the habeas court, and the habeas court never made such a finding. The respondent suggests that the misleading nature of the GeoTime video pertained only to Hussey's failure to seek a *Porter* hearing, and the habeas court concluded that the petitioner failed to establish that that failure had prejudiced him by proving that the CSLI evidence would have been excluded. According to the respondent, "the [habeas] court did not conclude that Hussey was ineffective for failing to object to, or request the exclusion of, any portion of the CSLI evidence on the ground that it was unduly prejudicial." He further argues that, although the misleading nature of the GeoTime video "may have informed" the habeas court's conclusion that Hussey performed deficiently, it "did not, as the petitioner contends, serve as an independent determination that Hussey was ineffective for failing to object, 'present a defense,' or 'respond' to the CSLI evidence through means other than cross-examination."

We reject the respondent's narrow construction of both the petitioner's ineffective assistance claims and the habeas court's decision. Instead, we conclude that the habeas court's determination that Hussey performed deficiently is predicated on its findings that the GeoTime video "actively misrepresented" the capabilities of CSLI and that the video would not have been admitted into evidence if Hussey had objected.[14]

"It is well established that the construction of a judgment presents a question of law over which we exercise

[14]After the respondent filed his reply brief, the petitioner sought permission to file a late motion for articulation to resolve the parties' dispute as to the significance of the habeas court's finding that the GeoTime video was misleading and whether that video would have been excluded if Hussey had objected to it when offered by the state. Because

plenary review. . . . In construing a trial court's judgment, [t]he determinative factor is the intention of the court as gathered from all parts of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent construction as a whole." (Citation omitted; internal quotation marks omitted.) *Bauer* v. *Bauer*, 308 Conn. 124, 131, 60 A.3d 950 (2013). Similar principles apply to our construction of pleadings. See, e.g., *Hepburn* v. *Brill*, 348 Conn. 827, 848, 312 A.3d 1 (2024) ("[t]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory [on] which it proceeded, and do substantial justice between the parties" (internal quotation marks omitted)).

The record and the habeas court's decision establish that the petitioner distinctly raised his ineffective assistance claim predicated on Hussey's failure to challenge the admissibility of the GeoTime video. In the operative habeas petition, the petitioner alleged that Hussey performed deficiently by failing to request a *Porter* hearing or "to otherwise challenge the . . . admission of cell phone coverage maps . . . ." At the habeas trial, Romano testified that reasonably competent defense counsel "would be able to know that [the GeoTime] video . . . is misleading, and, at least, they would know to challenge it . . . ." Hussey himself acknowledged that he should have objected to the GeoTime video on the ground that it was unduly prejudicial in its depiction of a human silhouette moving to precise locations. In his posttrial brief, the petitioner argued that Hussey failed to "raise available challenges to the admissibility and scope of" the state's CSLI evidence, including requesting the "removal of the depiction of a

we conclude that the habeas court's memorandum of decision adequately sets forth its factual findings and its conclusions of law in light of those facts, an articulation is not necessary for meaningful appellate review. See, e.g., *Journal Publishing Co.* v. *Hartford Courant Co.*, 261 Conn. 673, 687–88, 804 A.2d 823 (2002) (articulation is unnecessary when memorandum of decision adequately states factual basis for court's decision). Accordingly, the petitioner's request for permission to file a late motion for articulation is denied.

person moving around the city." Thus, the petitioner distinctly raised his ineffective assistance claim related to the GeoTime video by pleading it in his petition and by presenting evidence and argument in support of it at the habeas trial. See, e.*g.*, *Eubanks* v. *Commissioner of Correction*, 329 Conn. 584, 601–602, 188 A.3d 702 (2018) (claim is distinctly raised when it is set forth in habeas petition and petitioner presents evidence and argument in support thereof at habeas trial).

Importantly, the habeas court understood the petitioner's claim in this way. At the outset of its decision, the habeas court stated its conclusion that Hussey "performed deficiently when he *failed to challenge the admissibility* of [CSLI] testimony, including [the Geo-Time video] purporting to show the [petitioner's] path of travel, from . . . Weaver and that *this failure prejudiced* [the petitioner]." (Emphasis added.) Although the court did not expressly state that the GeoTime video would have been excluded as unduly prejudicial if Hussey had objected at trial, that conclusion is necessarily implied by the court's analysis. The court (1) found that the GeoTime video "not only stretched the capabilities of CSLI, but actively misrepresented it," (2) noted that the significance of "GeoTime's visual rendition of movement by the cell phone, which was depicted as a person's silhouette, cannot be overstated," (3) discussed the various, alternative ways that the CSLI evidence could have been accurately depicted in the GeoTime video; see footnote 12 of this opinion; and (4) "examine[d] the impact of the uncontested, uncontradicted, and highly suggestive evidence on the [jury] resulting from [Hussey's] deficient performance . . . ."

Admittedly, the habeas court's decision is not a model of clarity in this respect. The court's initial statement of its conclusion does not refer to Hussey's failure to investigate the CSLI evidence or to cross-examine Weaver, whereas the court emphasized those failures in its analysis of the petitioner's ineffective assistance claims. Nevertheless, it is readily apparent that the

court determined that (1) reasonably competent counsel would have challenged the admissibility of the GeoTime video or responded to that misleading evidence in some way, and (2) because the GeoTime video "actively misrepresented" the capabilities of CSLI, if Hussey had challenged the admissibility of the exhibit on that basis, the objection would have been sustained. See Conn. Code Evid. §4-3 ("[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice . . . or misleading the jury"). The respondent's suggestion that the misleading nature of the GeoTime video was relevant only to Hussey's failure to request a *Porter* hearing is belied by the habeas court's analysis, which focused exclusively on the GeoTime video and its impact on the jury.

Consequently, we agree with the petitioner that the habeas court determined that Hussey had performed deficiently by failing to challenge or respond to the misleading GeoTime video and that the GeoTime video would not have been admitted into evidence if there had been an appropriate challenge to its admissibility. Having resolved this threshold issue, we turn to the respondent's challenges to the habeas court's judgment.

## II

The respondent first claims that the habeas court incorrectly concluded that Hussey had performed deficiently. Specifically, he claims that (1) the record does not support the court's factual finding that Hussey failed to investigate the CSLI evidence, and (2) Hussey's testimony as to his strategic reasons for declining to cross-examine Weaver precluded the court from finding that this failure constituted deficient performance.[15] We disagree.

A criminal defendant's right to the effective assistance of counsel is guaranteed by the sixth amendment to the

---

[15]Due to the respondent's misreading of the habeas court's decision, he neither challenges the habeas court's factual finding that the GeoTime video was misleading nor argues that the habeas court improperly relied on that fact to conclude that Hussey had performed deficiently by failing to challenge the admissibility of that misleading exhibit.

United States constitution, which serves "to ensure that criminal defendants receive a fair trial." *Strickland* v. *Washington*, supra, 466 U.S. 689; see id., 685–86. To satisfy *Strickland*'s performance prong, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." Id., 688. In other words, the petitioner must establish that, considering all of the circumstances, "his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Internal quotation marks omitted.) *Michael T.* v. *Commissioner of Correction*, 319 Conn. 623, 631, 126 A.3d 558 (2015).

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Emphasis omitted; internal quotation marks omitted.) Id., 632.

The nature and extent of cross-examination are a matter of trial strategy. See, e.*g.*, *Balbuena* v. *Commissioner of Correction*, 231 Conn. App. 289, 338, 332 A.3d 1008, cert. denied, 352 Conn. 905, 335 A.3d 845 (2025). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland* v. *Washington*, supra, 466 U.S. 690–91.

Because "*Strickland* calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind," the habeas court is not confined to counsel's stated strategic reasons; rather, the court must "entertain the range of possible reasons trial counsel might have had for the challenged action." (Emphasis omitted; internal quotation marks omitted.) *Jordan* v. *Commissioner of Correction*, 341 Conn. 279, 290, 267 A.3d 120 (2021).

## A

The respondent claims that the habeas court's finding that Hussey failed to investigate the CSLI evidence is not supported by the evidence in the record and, alternatively, that "any limitation in Hussey's investigation . . . is reasonably explained by Hussey's strategic decision to focus more heavily on undermining the state's eyewitness identification evidence." Relying on the "strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect"; (internal quotation marks omitted) *Harrington* v. *Richter*, 562 U.S. 86, 109, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011); the respondent argues that Hussey reasonably limited his investigation "because the CSLI evidence, at best, placed the petitioner within two miles of the crime scene at the time of the shooting, whereas the eyewitnesses placed the petitioner at the crime scene and identified the petitioner as the shooter." (Emphasis omitted.) The petitioner responds that, even if Hussey's decision to limit his investigation into the CSLI evidence was a reasonable strategy, "it could not justify [Hussey's] later action of completely failing to respond to the GeoTime video in any way." We agree with the petitioner.

As Romano's testimony at the habeas trial established, reasonably competent defense counsel would have recognized the misleading aspects of the GeoTime video and would not have allowed it to be admitted into evidence without challenging it in some way. The habeas court acknowledged that Hussey's defense strategy of focusing

on the eyewitness identifications was reasonable but then immediately noted that Hussey neither "appreciated the impact the GeoTime [video] likely would have on the jury" nor "challenged Weaver's testimony and [related] evidence" at all. Thus, the court's determination that Hussey performed deficiently does not depend on the extent of Hussey's investigation into the CSLI evidence and Weaver's testimony because Hussey's failure to respond to that evidence in any way allowed "the GeoTime [video] to appear more reliable than it was." Put differently, regardless of the adequacy of Hussey's pretrial investigation into the CSLI evidence, Hussey's failure to respond to that evidence was the basis for the habeas court's finding of deficient performance, and the respondent has not challenged that finding in this appeal.

B

The respondent next claims that the habeas court erred in concluding that Hussey performed deficiently by failing to cross-examine Weaver. He argues that, when "the evidence [is viewed] from Hussey's perspective at the time of the criminal trial, it is clear that Hussey made an informed, strategic decision not to cross-examine Weaver." According to the respondent, Hussey's strategic reasons included (1) focusing on the eyewitness identification testimony, (2) not wanting to go "toe-to-toe" with Weaver and instead opting to use his testimony to support the defense's theory of the case during closing argument, (3) believing that, because the CSLI evidence was "a reach," allowing it to stand demonstrated the weakness of the state's case, and (4) believing that the GeoTime video and related testimony had not hurt his case, and that he "didn't have anything to work with" on cross-examination. The respondent's argument again misunderstands the petitioner's claim and the basis for the habeas court's decision.

We agree that Hussey's testimony at the habeas trial makes clear that his trial strategy was to focus on the eyewitness identifications and to downplay the significance of the CSLI evidence. Hussey testified that he was not

"completely concerned with" the GeoTime video because it seemed like "a reach" by the state when Weaver "had to acknowledge that you're at least" one and one-half miles away from the cell site. Rather than cross-examining Weaver, Hussey intended to "use what he said to [Hussey's] advantage in [his] closing." Hussey did not recall his specific arguments but assumed that he would have focused on the facts that the phone could have been anywhere within a one and one-half mile radius of the various cell sites and that Weaver "couldn't say anything . . . with any degree of certainty . . . ."

Hussey's stated strategy was not objectively unreasonable. Competent counsel reasonably could determine that it is better to point out flaws in an expert's testimony during closing argument than to go "toe-to-toe" with the expert during cross-examination. See, e.g., *Resnick* v. *United States*, 7 F.4th 611, 621 (7th Cir. 2021) (defense counsel employed reasonable trial strategy of allowing prosecution "to overplay its hand with expert testimony" and "followed through on that strategy" by arguing in closing "that such overkill looked ridiculous" (internal quotation marks omitted)); *State* v. *Pandeli*, 242 Ariz. 175, 181–83, 394 P.3d 2 (2017) (defense counsel made reasonable, strategic decision to forgo cross-examining state's expert witness to avoid eliciting testimony that could further harm defense), cert. denied, 583 U.S. 1062, 138 S. Ct. 645, 199 L. Ed. 2d 545 (2018); *State* v. *Rhodes*, 657 N.W.2d 823, 844 (Minn. 2003) (defense counsel did not perform deficiently by seeking to minimize impact of "the state's strongest witness" with limited objections on direct examination "to get [the witness] on and off the stand quickly"). Similarly, counsel could tactically decide not to object to the admission of certain evidence if he thought he could show the unreliability of the evidence during closing argument. The problem, however, is that Hussey failed to execute any such strategy, as reflected in the record of the petitioner's criminal trial.

Hussey testified at the habeas trial that he viewed the GeoTime video as "a reach" on the state's part and that he

planned to use Weaver's concessions in closing, yet, when the prosecutor in closing leaned heavily on the GeoTime video and CSLI evidence, Hussey made only a passing reference to Weaver's concessions and said nothing about the video's distortions of the underlying data.[16] Instead, he floated the tenuous claim that the phone was Christian's—an argument that, given Colon's identification of the petitioner's phone and subscriber information, bordered on the fanciful and only reinforced the prosecutor's argument that the GeoTime video accurately depicted the movement of the phone around each incriminating location. Rather than minimizing the significance of the CSLI evidence, Hussey's closing argument effectively endorsed its accuracy. "Because advocacy is an art and not a science"; *Strickland* v. *Washington*, supra, 466 U.S. 681; defense counsel has wide latitude in strategy, and Hussey could have employed any number of tactics in defending the petitioner. As Romano testified at the habeas trial, reasonably competent counsel could have challenged the reliability of the CSLI and the misleading GeoTime video through a *Porter* hearing, a motion in limine, cross-examination, or a defense expert. Hussey pursued none of these options and did not follow through on his own alternative strategy. Simply having a strategy is not enough. Effective assistance of counsel requires implementation of the strategy, and Hussey performed deficiently by failing to execute his strategy or any of the alternative strategies identified by Romano, which allowed the state's "strongest piece of evidence" to appear virtually unassailable. See, e.g., *Elliott* v. *Williams*, 248 F.3d 1205, 1209 (10th Cir.) ("the proper functioning of the adversarial process contemplates the presentation of adverse views of the evidence"), cert. denied, 534 U.S. 927, 122 S. Ct. 286, 151 L. Ed. 2d 211 (2001).

---

[16]Hussey noted only that Weaver could not say which direction the phone was traveling, who had it, or even where it was—just where it wasn't. He added, without explanation, that, if the phone really were the petitioner's, "he doesn't go anywhere." Contrary to his testimony at the habeas trial, Hussey neither challenged the range of the CSLI information nor argued that the GeoTime video was misleading or inaccurate.

On these facts, Hussey's failure to present any meaningful defense to the state's CSLI evidence, in particular to the GeoTime video, was "outside the wide range of professionally competent assistance." *Strickland* v. *Washington*, supra, 466 U.S. 690. Accordingly, in light of Hussey's proffered strategy, and in the absence of any other conceivable reason for failing to challenge or respond to the CSLI evidence, we conclude that the habeas court correctly determined that Hussey's representation "fell below an objective standard of reasonableness." Id., 688.

## III

The respondent next claims that the habeas court erred in determining that Hussey's deficient performance prejudiced the petitioner. We disagree.

"To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Jordan* v. *Commissioner of Correction*, supra, 341 Conn. 287. "A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . In making a prejudice determination, habeas courts must consider the totality of the evidence before the . . . jury. . . . [S]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, whereas some will have had an isolated, trivial effect. . . . [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. . . . A court's ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." (Citations omitted; internal quotation marks omitted.) *Grant* v. *Commissioner of Correction*, 354 Conn. 30, 41–42, 348 A.3d 463 (2026).

At the petitioner's criminal trial, the state presented testimony from Lara and DeJesus, who testified that

they had identified the petitioner as the shooter in a photographic array, and the arrays were introduced into evidence. Lara was uncooperative and refused to answer questions at several points during cross-examination but eventually conceded that she did not know whether the petitioner was the person who shot the victim. DeJesus testified on cross-examination that he saw the shooter "[f]or a couple of seconds," and Hussey highlighted inconsistencies between DeJesus' statement to the police and his testimony at trial. For example, DeJesus admitted that, in his initial statement to the police, he described the shooter as having cornrows, which did not describe the petitioner. DeJesus, however, maintained that he had "no doubts" that the petitioner was the shooter.

In addition to the CSLI evidence, there was testimony from Colon that the petitioner had asked her to cash a check for Christian within hours of the shooting and that she had identified the phone recovered by the police as the petitioner's. The state also presented consciousness of guilt evidence—the petitioner fled when approached by the police, changed his cell number the day after the shooting, and gave a false name when arrested.

The habeas court found prejudice because Hussey failed to challenge the GeoTime video or Weaver's accompanying testimony, concluding that "the uncontested and highly suggestive GeoTime rendering of the CSLI data affected the outcome of the jury trial." The court emphasized that the state's case was not strong: the eyewitness identifications by Lara and DeJesus were weak and had been effectively undermined by Hussey. In contrast, the GeoTime video and Weaver's testimony formed the core of the prosecution's theory, as shown by the prosecutor's closing, in which he labeled the phone the state's "strongest piece of evidence" and relied heavily on the video's misleading depiction of the phone's movements. Citing *State* v. *Raynor*, 337 Conn. 527, 547–48, 254 A.3d 874 (2020), and *State* v. *Jackson*, 334 Conn. 793, 818–19, 821, 224 A.3d 886 (2020), in which we concluded that the improper admission of expert testimony was not harmless error, the court observed that technical expert visuals of

this sort are especially persuasive to juries and concluded that "Weaver's expert opinion would have been viewed as highly convincing," particularly because the defense offered no challenge to that evidence.

On the basis of our independent review of the record, we conclude that the habeas court properly assessed the impact of Hussey's deficient performance on the outcome of the petitioner's criminal trial. As the habeas court noted, the state's case was not overwhelming and relied primarily on the CSLI evidence, in particular the GeoTime video, to connect the petitioner to the murder. To be sure, Colon's testimony implicated the petitioner in the sale of the victim's jewelry, but, given the weakness in the eyewitness identifications, the CSLI evidence was the state's strongest evidence tying the petitioner to the murder. The prosecutor acknowledged this point and relied extensively on the GeoTime video in summation and rebuttal. Hussey's failure to challenge the misleading GeoTime video in any way left the jury with no reason to question its accuracy. Considering the persuasive effect of expert evidence, a visual depiction that overstated the capabilities of the underlying data was particularly powerful when left unchecked by the defense. Had Hussey made *any* effort to undermine that evidence, we agree with the habeas court that there is a reasonable probability that the result of the proceeding would have been different.

The respondent's arguments to the contrary suffer from his misreading of the habeas court's decision. He argues that the petitioner failed to show prejudice for four reasons: **(1)** because the petitioner did not call Weaver at the habeas trial, he cannot establish harm from Hussey's failure to cross-examine him; **(2)** the petitioner presented no new CSLI evidence that the jury had not already heard; **(3)** the habeas court never concluded that the CSLI evidence was improperly admitted or that it would have been excluded had counsel challenged it; and **(4)** Weaver's testimony was not the only evidence

identifying the petitioner, making this case distinguishable from *Raynor* and *Jackson*. We are not persuaded.

First, we agree with the respondent that, when a petitioner claims that the failure to cross-examine a witness constituted deficient performance, he ordinarily must demonstrate how a particular witness would have testified in order to establish prejudice. See, e.g., *Jones* v. *Commissioner of Correction*, 212 Conn. App. 117, 131–32, 274 A.3d 237, cert. denied, 343 Conn. 933, 276 A.3d 975 (2022). Here, however, the petitioner's claim does not rest on Hussey's failure to cross-examine Weaver. As we previously noted, the decision not to cross-examine Weaver would have been a reasonable tactical decision had Hussey employed a different strategy to challenge the CSLI evidence, particularly the GeoTime video. As the habeas court found, though, Hussey failed to challenge that evidence in any meaningful way. The failure to call Weaver as a witness at the habeas trial was therefore inconsequential to the habeas court's ultimate analysis.

Second, the petitioner was not required to present "new" CSLI evidence to show prejudice because the problem with the GeoTime video should have been evident to a lawyer familiar with CSLI evidence, as Hussey claimed he was. Clark and Weaver had both acknowledged that CSLI does not pinpoint a cell phone's location or trace its movements, which is precisely what the video purported to do, and Hussey did nothing to disabuse the jury of that suggestion.

Third, as we concluded in part I of this opinion, although the habeas court did not expressly state that the GeoTime video would have been excluded had Hussey raised a proper objection to its admissibility, that conclusion is clearly implied from the court's finding that the GeoTime video "actively misrepresented" the capabilities of CSLI.[17]

Finally, the respondent contends that, because Weaver's testimony was not the only evidence identifying the

[17]During oral argument before this court, counsel for the respondent argued that, even if the GeoTime video had been excluded, the jury

petitioner, this case is distinguishable from *State* v. *Raynor*, supra, 337 Conn. 527, and *State* v. *Jackson*, supra, 334 Conn. 793. Neither case, though, involved an underlying factual finding, as in the present case, that the state's CSLI evidence was misleading because it "actively misrepresented" the capabilities of the underlying data, a finding the respondent does not challenge. And neither case purports to announce a bright-line rule that a habeas petitioner can prove he was prejudiced by the failure to exclude evidence only if there is no other evidence in the criminal trial record identifying the petitioner as the perpetrator. The habeas court in the present case considered the eyewitness testimony presented at trial and found it to be weak. By contrast, the court found that the misleading animated map has a visceral impact on the viewer. We cannot conclude that the habeas court erred in its assessment of the impact of that misleading GeoTime video on the verdict.

The judgment is affirmed.

In this opinion the other justices concurred.

---

still would have had the "still images of the mapped phone calls" that also were admitted into evidence. Those "still images," however, are screenshots from the GeoTime video depicting a human silhouette in specific locations inside the coverage areas. Notably, these images also display the underlying data for each mapped call, including the distances between the cell site used for the call and the cell sites associated with the preceding and subsequent calls, as well as the calculated travel speed based on the data. In doing so, the screenshots reinforce the misleading aspects of the GeoTime video by indicating movement and by depicting a human silhouette in a specific location.